# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

| | |
|---|---|
| SHEMSIA SHEFFA,<br><br>    Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>    Defendant. | Case No. CV 06-05211 (SH)<br><br>MEMORANDUM DECISION<br>AND ORDER |

    This matter is before the Court for review of the Decision by the Commissioner of Social Security denying plaintiff's application for Supplemental Security Income under Title XVI of the Social Security Act. Pursuant to 28 U.S.C. § 636(c), the parties have consented that the case may be handled by the undersigned. The action arises under 42 U.S.C. § 405(g), which authorizes the Court to enter judgment upon the pleadings and transcript of the record before the Commissioner. The plaintiff and the defendant have filed their pleadings, the defendant has filed the certified transcript of record, and the parties have filed a joint stipulation. After reviewing the matter, the Court concludes that the decision of the Commissioner should be affirmed.

    On December 16, 1999, plaintiff Shemsia Sheffa filed an application for

Supplemental Security Income, alleging an inability to work since September 9, 1999 due to major depression. (Administrative Record ["AR"] 113-16, 135-44). On August 29, 2001, an Administrative Law Judge ("ALJ") determined that plaintiff was not disabled within the meaning of the Social Security Act. (AR 15-22).

Following the Appeals Council's denial of plaintiff's request for a review of the hearing decision (AR 6-7, 10-11), plaintiff filed an action in this Court. On August 7, 2003, the Court remanded the matter in order for the ALJ to fully and fairly develop the record pertaining to plaintiff's excess pain allegations and to set forth clear and convincing reasons for rejecting plaintiff's excess pain testimony. (AR 380-95). The Appeals Council subsequently remanded the case to an ALJ. (AR 397-98).

In addition to alleging depression, plaintiff alleged an inability to work due to low back pain, joint pain, rheumatoid arthritis, migraine headaches, heavy menstrual bleeding, uterine fibroids, anemia, vertigo and diarrhea. (See AR 432-37, 500-01, 503, 505-08, 528, 530-33). On August 22, 2005 (on remand) (hereinafter referred to as the "2005 Decision"), another ALJ determined that, although plaintiff's anemia due to menorrhagia with a history of fibroids and plaintiff's depressive disorder were considered "severe," plaintiff was not disabled within the meaning of the Social Security Act. (AR 368-79).

After plaintiff failed to timely request a review of the hearing decision (AR 357-63), plaintiff filed another action in this Court. On October 5, 2006, based on a Stipulation to Remand the Case because of the inability to locate the administrative file, the Court ordered that the matter be remanded pursuant to Section 6 of Section 205(g) of the Social Security Act. On January 11, 2008, based on a Stipulation to Reopen the Case, the Court ordered the reopening of the case.

Plaintiff makes eight challenges to the ALJ's 2005 Decision denying benefits. Plaintiff alleges that the ALJ erred in (1) making unsupported findings about plaintiff's pain testimony and medical expert Dr. Alpern's testimony; (2) failing to properly evaluate the medical reports of plaintiff's treating physicians; (3) failing to properly

2

evaluate plaintiff's subjective complaints, including her pain testimony; (4) failing to properly evaluate plaintiff's use of medications and the possible side effects of such use; (5) failing to properly evaluate plaintiff's maximum residual functional capacity; (6) failing to properly evaluate the medical-vocational guidelines; (7) failing to properly evaluate the vocational expert's testimony; and (8) failing to properly evaluate new evidence.  Each of plaintiff's contentions will be addressed in turn.

**ISSUE NO. 1:**

Plaintiff asserts that the ALJ made an unsupported findings about Dr. Alpern's testimony and about plaintiff's exaggerated pain testimony.[1]  In response, respondent argues that substantial evidence supported the ALJ's findings.

At a hearing on March 10, 2005, medical expert Harvey Alpern, M.D., testified that plaintiff likely had a fibroid tumor in her uterus that could cause anemia, and that plaintiff could either live with it (in discomfort) or have it surgically removed.  (See AR 508-09).  The ALJ simply noted Dr. Alpern's testimony.  (AR 375).  The ALJ found that plaintiff's anemia due to menorrhagia with a history of fibroids was severe.  (AR 378).  Contrary to plaintiff's assertion, the ALJ did not expressly accept Dr. Alpern's testimony about plaintiff's options with respect to her fibroid tumor.  Nonetheless, since Dr. Alpern was subject to cross-examination (see AR 511-13) and since plaintiff has not pointed to evidence in the record contradicting Dr. Alpern's expert testimony, the ALJ was entitled to rely on Dr. Alpern's testimony.  See Andrews v. Shalala, 53 F.3d 1035, 1042 (9th Cir. 1995).

With respect to the ALJ's finding regarding plaintiff's exaggerate pain testimony, the record reflects the following.  On April 7, 2005, Roger A. Izzi, PhD, conducted a consultative psychiatric evaluation of plaintiff.  (See AR 444-48).  Dr. Izzi reported the

---

[1]  Plaintiff has alleged several claims concerning her pain testimony. Plaintiff's other claims regarding her pain testimony will be addressed in other sections.

3

following: "She stated that she experiences auditory-type of hallucinations when she is "very depressed."  When asked what she hears, she responded, 'My kids are in trouble, or something bad is going to happen to me.  (AR 445).  After noting that plaintiff had always denied having any hallucinations in the past (AR 374; see AR 216, 274, 279, 284, 348), the ALJ found that plaintiff's statement that she was hallucinating was not credible and was "just another exaggeration on [that] date in which she is attempted to portray symptoms which are not actually present in order to increase the chance of obtaining benefits."  (AR 374).  The conflict between plaintiff's subjective complaint and the objective medical evidence constituted substantial evidence in support of the ALJ's determination about plaintiff's credibility.  See Thomas v. Barnhart, 278 F.3d 947, 959-60 (9th Cir. 2002); Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).

## ISSUE NO. 2:

Plaintiff asserts that the ALJ erred in rejecting the opinions of Louis Simpson, M.D., plaintiff's treating psychologist.  Plaintiff further asserts that the ALJ failed to explain the weight given to some of plaintiff's treating physicians' opinions on plaintiff's internal medical problems and pain problems.

In response, defendant argues that the ALJ properly rejected the opinions of Dr. Simpson.  Defendant further argues that the ALJ properly considered the opinions of plaintiff's treating physicians.

Plaintiff challenges the ALJ's decision to reject Dr. Simpson's opinions.  In a Medical Provider Evaluation dated December 13, 1999, Dr. Simpson, who had treated plaintiff since December 2, 1999 (see AR 273), stated that plaintiff was unable to work until June 15, 2000.  (See AR 184).  In a Mental Form for Mental Disorders, dated December 22, 1999, Dr. Simpson stated that plaintiff was expected to improve with medications and treatment within 2 years. (See AR 226-29).  In a Mental Assessment

4

Form dated March 1, 2001, Dr. Simpson indicated that plaintiff was markedly or moderately limited in understanding and memory, sustained concentration and persistence, and adaptation; and that plaintiff was unable to work in a work setting. (See AR 275-78). In a Mental Assessment dated February 12, 2005, Dr. Simpson, who had treated plaintiff from December 20, 1999 to April 3, 2001 (see AR 279-86), indicated that plaintiff was markedly or slightly limited in understanding and memory, and markedly or moderately limited in sustained concentration and persistence, social interaction, and adaptation. (See AR 421-424). Dr. Simpson opined that plaintiff was not able to work or make plans to work. (See AR 423).

With respect to Dr. Simpson's March 1, 2001 opinions, the ALJ noted that "there are few objective findings and his opinion appears to have been based mostly on the complaints and history from the claimant." (AR 371). With respect to Dr. Simpson's February 12, 2005 opinions, the ALJ noted that "Dr. Simpson has provided no treatment notes, no report of mental status evaluations, and no indication that he even continued to have a treating relationship with [plaintiff]." (AR 374). The ALJ further noted plaintiff's statement during a consultative psychiatric evaluation in June 2001 that she was not having any outpatient mental health treatment. (Id.; see AR 345).

Since Dr. Simpson's March 1, 2001 opinions were primarily based on subjective complaints, and since there were no records showing that Dr. Simpson treated plaintiff from April 2001 to February 2005, the ALJ was entitled to not give any weight to Dr. Simpson's opinions about plaintiff's inability to work based on severe mental symptoms. (AR 374). See Magallanes v. Bowen, 881 F.2d 747, 751 (1989) ( "[T]he ALJ need not accept a treating physician's opinion which is 'brief and conclusionary in form with little in the way of clinical findings to support its conclusion.'"); Burkart v. Bowen, 856 F.2d 1335, 1339 (9th Cir. 1988) ("A treating physician's medical opinion unsupported by described medical findings, personal observations, or test results may be rejected."); 20 C.F.R. § 416.927(b)-(d) (The weight given a treating physician's opinion depends on

5

whether it is supported by sufficient medical data and is consistent with other evidence in the record).

Moreover, the ALJ's finding was consistent with the Court's August 2003 finding (which the ALJ cited and relied on) that the ALJ in the 2001 Decision correctly determining that Dr. Simpson's March 1, 2001 opinions that plaintiff was unable to work were entitled to very little weight because such opinions were "based almost entirely on Plaintiff's self-serving complaints," because Dr. Simpson "provided no objective medical evidence as to why, in his opinion, Plaintiff was disabled," and because Dr. Simpson "never performed any type of objective mental test, nor did he administer a mental status examination on Plaintiff" (see AR 391-92).  (See AR 371).

Finally, the ALJ found that plaintiff was able to work based, in part, on a June 19, 2001 consultative psychiatric examination, in which David Bedrin, M.D., determined that plaintiff was able to work (even though she was moderately limited in her ability to perform detailed tasks as a result of her memory problems).  (See AR 373; AR 344-50). Dr. Bedrin's opinions constituted substantial evidence supporting the ALJ's decision to reject Dr. Simpson's opinions.  See Magallanes, supra ("To reject the opinion of a treating physician which conflicts with that of an examining physician, the ALJ must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record."); Andrews v. Shalala, supra, 53 F.3d at 1041 (Where "the opinion of a treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict.").

Plaintiff further challenges the ALJ's consideration of the medical records of plaintiff's treating physicians, including: L. Khadijah Lang, M.D. (see AR 182, 287-91 [3F, 27F]); Dr. Simpson (see AR 184, 272-86 [5F, 23F, 25F, 26F1]); California Hospital Medical Center (see AR 185-209, 297-300 [6F, 30F]; Southern California Sports Rehab

(see AR 212-13 [8F]); Kaiser Permanente (see AR 214 [9F]); Clinica Metropolitana (see AR 269-271, 292-95 [21F, 22F, 28F]; Augustus F. Hawkins Mental Health Center (see AR 273-74 [24 F]); Komfort Care Medical Group (see AR 296 [29F]); and Good Samaritan Hospital (see AR 301-33 [31F]).

Dr. Lang, who apparently treated plaintiff from October 7, 1999 to November 4, 1999, stated that he did not believe plaintiff would be able to work or attend school until the end of November.  (See AR 182, 287-91).  The ALJ addressed the medical records of Dr. Lang as follows:  "[Plaintiff] also complained of arthralgias in her right shoulder, right knee, and left chest pain for which her doctor had prescribed Motrin (see Exhibits 3F and 27F dated October 14, 1999 and November 4, 1999, wherein Dr. Lang stated that the claimant is "medically unable to work or attend classes. . . for this condition," the "condition" being that she had palpitations with stress with thinking of her school situation)."  (AR 370).

As discussed above, the ALJ properly rejected the opinions of Dr. Simpson.

Plaintiff was treated at California Hospital Medical Center on October 19, 1999, and from December 27 to 29, 1999.  (See AR 186-209; 297-300).   The ALJ stated: "Medical report from California Hospital Medical Center reveals that the claimant presented on October 19, 1999 with 'multiple complaints mostly related to stressors at school due to her differences in belief system and religious habits.'"(AR 370; see AR 196; 300).  With regard to treatment on October 19, 1999, the ALJ stated: " Examination was essentially normal.  EKG was normal.  It was recommended that she seek support with her religious affiliations.  There was no evidence of cardiopulmonary disease.  Diagnosis was reactive depression and somatization."  (AR 370; see AR 191-92).  The ALJ further stated: "The [plaintiff returned on December 27, 1999 with an aching chest pain elicited by stress that she reported experiencing when she was planning to file a grievance in court.  She believes her emotional stress is related to her Islamic faith, dress

and dietary habits. Chest X-ray, EKG and all laboratory tests were normal." (AR 370-71; see AR 185-90, 194, 197-209, 299).

There were no medical records provided by either the Southern California Sports Rehab or Kaiser Permanente. (See AR 212-14).

Plaintiff was treated at Clinica Metropolitana in March and April 2001. (See AR 269-271, 292-95). The ALJ described the records as follows:

> "In March 2001, the [plaintiff] was noted to have impacted ear wax, hyperlipids, dizziness, and increased bowel movements when taking antibiotics. She was taking Ibuprofen, Paxil, Temazepam and Meclizine (Exhibit 21F). Lab results revealed slightly low hemoglobin and hematocrit and positive RA, but there were no complaints of symptoms of rheumatoid arthritis, nor was any treatment given for such a condition (Exhibit 22F). On April 5, 2001, the [plaintiff] was taking Baycol for hyperlipidia, Ibuprofen and Paxil. Her only complaint appeared to be regarding her ears. Diagnosis was depression and adjustment disorder (Exhibit 28F)." (AR 372; see AR 269-71, 292-95).

Plaintiff was treated at the Augustus F. Hawkins Mental Health Center on December 2, 1999. (See AR 273-74). The ALJ stated that, "Treatment note dated December 2, 1999 reveals that the [plaintiff] presented with complaints of anxiety and depression due to problems at school. He diagnosed adjustment disorder with mixed features. (See AR 371).

Plaintiff was treated at the Komfort Care Medical Group on October 21, 1999. (See AR 183, 296). The ALJ gave the following description: "On October 21, 1999, the [plaintiff] presented at Komfort Care Medical Group complaining of anxiety for which Buspar was prescribed." (AR 371).

Plaintiff was treated at Good Samaritan Hospital on February 1, 2001. (See AR 301-33). The ALJ described the medical records as follows: "Medical report from Good

Samaritan Hospital reveals that the [plaintiff] presented on February 1, 2001 with complaints of dizziness for two weeks. She denied headache, nausea or hearing changes. Physical examination was essentially normal. She reported that he dizziness improved with Antivert." (AR 372).

None of the medical records discussed above (with the exception of Dr. Simpson, which the Court has already addressed) stated or suggested that plaintiff suffered medical complaints which affected or limited her ability to work. Plaintiff has not alleged what limitations or impairments contained in the medical records above the ALJ failed to consider, or how the ALJ's failure to consider such limitations or impairments affected the analysis. Contrary to plaintiff's assertion, the ALJ gave proper consideration and weight to the medical records of plaintiff's treating physicians. In any event, it was unnecessary for the ALJ to address any evidence that was not significant or probative. See Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

### ISSUE NO. 3:

Plaintiff asserts that the ALJ failed to provide adequate reasons for rejecting plaintiff's subjective complaints (specifically relating to her fibroid tumor disease), including her pain testimony. In response, defendant argues that the ALJ provided specific reasons for finding plaintiff's subjective complaints not credible.

At the 2001 hearing, plaintiff testified she experienced constant pain. (See AR 33; see also AR 65). As noted above, the matter was remanded for the ALJ to address plaintiff's excess pain testimony. At the 2005 hearing (two sessions), there was testimony that plaintiff had a fibroid tumor, and plaintiff testified she experienced pain. (See AR 505-16, 521, 528, 530-32, 548, 556–57, 560).

The ALJ noted the absence of excessive pain evidence:

> "Review of the record revealed no evidence of complaints of excessive pain. Although there is one positive RA lab finding, there is essentially no

>evidence in the record of complaints of, or treatment for, rheumatoid or osteoarthritis. Although I held two hearings, there was not much testimony from the [plaintiff] in regard to her pain. She refuses, or is unable to stay on the subject. She is very histrionic, for lack of a better word." (AR 375).

Although plaintiff's subjective complaints, including pain testimony, were taken into consideration with respect to her work limitations, the ALJ found that plaintiff's credibility was "seriously questionable" based on plaintiff's lack of effort and exaggeration during two medical examinations. (See AR 376). In making that credibility determination, the ALJ cited to: (1) an April 5, 2005 consultative internal medicine evaluation during which plaintiff was not cooperative during a range of motion testing of the back (see AR 376; AR 374, 435-36); and (2) an April 7, 2005 consultative psychological evaluation during which plaintiff exaggerated about experiencing auditory hallucinations and whose results were "suggestive of a poor effort, poor motivation, and exaggeration" (see AR 376; AR 374-75, 446-48). The absence of medical evidence, as well as plaintiff's non-cooperation and exaggeration, constituted clear and convincing reasons to reject plaintiff's subjective complaints, including pain testimony. See Thomas v. Barnhart, supra, 278 F.3d at 959 (the plaintiff's failure to cooperate during medical evaluations supported the ALJ's credibility determination); Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996); Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); see also Lester v. Chater, 81 F.3d 821, 833 (9th Cir. 1996) (the ALJ need not set forth clear and convincing reasons for rejecting a claimant's excess pain testimony when there is affirmative evidence that the claimant is malingering).[2]

---

[2] The ALJ had another reason to reject plaintiff's subjective complaints. The ALJ noted that plaintiff's allegation that she was inactive for a number of years, which would have resulted in "significant degree of disuse muscle atrophy," was contradicted by medical evidence. (See AR 376). The doctor who conducted the April 5, 2005 examination reported that plaintiff's muscle tone and mass appeared to be normal. (See
(continued...)

**ISSUE NO. 4:**

Plaintiff asserts that the ALJ failed to properly evaluate plaintiff's use of medications and the effects such use had on plaintiff's ability to work. In response, defendant argues that the ALJ properly considered the side effects of plaintiff's medications.

Plaintiff apparently was prescribed the following medications: in 1999, Paxil (for depression); Ambien (for sleep), and Ibuprofen (for arthritis); and in 2004, Lipitor (for cholesterol), and hydrocortisone (for hemorrhoids). (See AR 493; see also AR 229, 279, 345, 488).

After noting that during a June 19, 2001 consultative psychiatric examination plaintiff reported that her depression was being treated with Paxil and Temazepam (see AR 345), the ALJ stated: "[Plaintiff] stated that the medication had a lot of side effects (but there is no mention in the medical evidence of the side effects)." (AR 373). There is nothing in the record (other than plaintiff's unsupported statement) indicating that plaintiff suffered side effects from her prescribed medications. Plaintiff has not specified what side effects she suffered, or how those side effects affected her ability to work. Since the side effects of the medications were not significant evidence, the ALJ was not obligated to discuss the side effects. See Vincent v. Heckler, supra; Osenbrock v. Apfel, 240 F.3d 1157, 1164 (9th Cir. 2000).

**ISSUE NO. 5:**

---

² (...continued)
AR 435). Such medical evidence was a sufficient basis for finding plaintiff to be not credible. See Lester v. Chater, supra, 8 F.3d at 834 ("[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.").

Plaintiff asserts that the ALJ failed to properly evaluate plaintiff's maximum residual functional capacity. Plaintiff argues that she is not able to do any heavy lifting or to stand or walk for over six hours because of her severe stomach and intestine problems. In response, defendant argues that substantial evidence supported the ALJ's finding regarding plaintiff's residual functional capacity.

On June 14, 2001, Robert Schatz, M.D. (a consultative medical examiner) found that plaintiff could occasionally lift 50 pounds, could frequently lift and/or carry 20 pounds, and could stand, walk and sit about 6 hours in an 8-hour workday. Dr. Schatz further found that plaintiff was limited to occasional climbing, balancing, kneeling and crawling. Dr. Schatz stated that plaintiff's "[f]unctional capacity was difficult to assess due to her presentation." (See AR 330-43).

On February 14, 2005, Oscar Moore, M.D., found that plaintiff was not able to sit, stand or walk any hours in an 8-hour workday, could not lift or carry anything, and could not bend, squat, crawl, climb or reach at all. (See AR 428).[3]

On April 5, 2005, Bryan To, M.D. (a consultative medical examiner) found that plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently, could frequently do activities requiring agility, and could frequently bend, crouch, kneel, crawl and stoop. (See AR 432-438).

---

[3] It is not clear from the record whether or not Dr. Moore was plaintiff's treating physician. See 20 C.F.R. § 416.902 (treating source is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.") There are no records from Dr. Moore other than the February 14, 2005 evaluation and a disability certificate issued for plaintiff on January 13, 2004 (see AR 429).
  The ALJ found Dr. Moore's evaluation of plaintiff not to be credible, because its conclusions were so extreme and because it was not supported by any treatment notes, objective findings or medical evidence. (See AR 373).

At the hearing on August 4, 2005, Dr. Harvey Alpern (a medical expert) testified that plaintiff should be limited to medium work[4] -- plaintiff could lift 50 pounds occasionally and 25 pounds frequently, and could stand, sit and/or walk six out of eight hours per workday. Dr. Alpern testified that plaintiff should not work at heights or use dangerous machine parts. (See AR 535).

The ALJ found that plaintiff had the residual functional capacity to lift/carry 50 pounds occasionally and 25 pounds frequently, and to stand, walk or sit for 6 out of 8 hours a day. The ALJ further found that plaintiff is able to perform work which is not detailed or complex; but that plaintiff "should not work around unprotected heights or around dangerous moving machinery." (See AR 377-378).

The ALJ's findings about plaintiff's abilities to lift, stand and walk were supported by Dr. Schatz's medical evaluation, and Dr. To's medical examination. The opinions of the consultative examiners and the medical expert constituted substantial evidence in support of the ALJ's findings about plaintiff's residual functioning capacity. See Morgan v. Commissioner, 169 F.3d 595, 600 (9th Cir. 1999); Andrews v. Shalala, supra; Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996)("[T]he findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings.").

Contrary to plaintiff's contention, the ALJ considered plaintiff's stomach and intestinal problems. At the hearing on August 4, 2005, plaintiff testified she had constant diarrhea and also suffered from constipation. (AR 530). Dr. Alpern testified that plaintiff's diarrhea problem had not been documented in the medical records. (AR 538). Dr. Alpern further testified that constipation, which could be caused by taking iron, is treatable. (Id.). The ALJ concurred with Dr. Alpern's assessments. (See AR 375-76).

---

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c).

Moreover, the ALJ found that plaintiff's allegations regarding her limitations were not totally credible. (See AR 376, 378). Nothing in the record shows that plaintiff suffered any work limitations as a result of her diarrhea and constipation.

### ISSUE NO. 6:

Plaintiff asserts that, because plaintiff's non-exertional limitations (severe depressive disorder, severe chronic pain)[5] limited the range of work plaintiff was capable of performing, the ALJ erred in applying the medical-vocational guidelines (the grids) . In response, defendant asserts that the ALJ properly used the grids as a framework and properly consulted a vocational expert.

The record is replete with documents/testimony concerning plaintiff's mental limitations. On February 18, 2000, Mark Perrault, M.D. (a consultative pyschiatric examiner) found that plaintiff was markedly to moderately impaired in her abilities to accept supervision, to interact with co-workers, and to interact with the public; moderately impaired with her abilities to remember and to concentrate; and markedly to moderately impaired in her abilities to adhere to a work-related schedule, to adapt to schedule changes, and to adapt and react to novel situations. (See AR 215-20).

On March 1, 2001, Dr. Simpson (plaintiff's treating psychologist) found that plaintiff was markedly or moderately limited in understanding and memory, sustained concentration and persistence, social interaction, and adaptation; and that plaintiff was unable to work in a work setting. (See AR 275-78).

On June 19, 2001, Dr. Bedrin (a consultative psychological examiner) found that plaintiff was moderately limited in her abilities to understand and remember detailed instructions, to carry out detailed instructions, to interact appropriately with the public,

---

[5] Nonexertional impairments include "certain mental, sensory, [and] skin impairments" as well as "postural and manipulative limitations [and] environmental restrictions." 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e).

supervisor(s) and co-workers, and to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting.  (See AR 349-54).

On February 12, 2005, Dr. Simpson found that plaintiff was markedly or slightly limited in understanding and memory; and markedly or moderately limited in sustained concentration and persistence, social interaction, and adaptation.  (See AR 421-24).

On April 7, 2005, Roger Izzi, PhD (a consultative psychological examiner) found that plaintiff had slight limitations with her abilities to understand and remember detailed instructions and to carry out detailed instructions.  (See AR 444-54).

At the hearing on August 4, 2005, Dr. Julian Kivowitz (a medical expert) testified that, although he generally gives more weight to the treating psychologist, there were three consultative psychiatrists who expressed opinions which differed from those of Dr. Simpson.  Dr. Kivowitz testified that plaintiff was slightly limited in the activities of daily living, moderately limited in social activities, and markedly to moderately limited in concentration.  (See AR 539-40).

As discussed above, the ALJ properly found Dr. Simpson's 2001 and 2005 evaluations of plaintiff not to be credible.  The ALJ also found Dr. Perrault's evaluation not to be credible, because it was colored by plaintiff's subjective complaints and was conducted at a time that plaintiff was dealing with school and family problems.  (See ALJ 372).

As noted above, the ALJ found that plaintiff was able to perform medium work which is "not detailed or complex" and does not involve "unprotected heights" or "dangerous moving machinery."

Since plaintiff's ability to perform medium work was impaired by exertional and/or nonexertional limitations, the ALJ used the medical-vocational Guidelines as a framework and consulted a vocational expert to help determine whether or not there were a significant number of jobs in the national economy plaintiff could perform given her age, education, past relevant work experience, and residual functional capacity.  (See AR

15

377-78, 553-55). The ALJ's analysis was proper. See Desrosiers v. Secretary of Health & Human Servs., 846 F.2d 573, 578 (9th Cir. 1988) ("The grids may be used as a *reference point* for decisionmaking when they do not accurately and completely describe a claimant's residual functional capacity, age, education, or work experience. However, under those circumstances 'the Secretary may not rely on the grids alone to show the availability of jobs for the claimant.' . . . The Secretary must *also* hear the testimony of a vocational expert.");20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e)(2).

To the extent that plaintiff merely is repeating his contention that the ALJ erred in her determination of plaintiff's residual functional capacity because of plaintiff's stomach pain, the Court has already addressed that contention.

To the extent that plaintiff is contending that the ALJ should have included limitations about plaintiff's stomach pain in her hypothetical question to the vocational expert, the Court will address plaintiff's contention in the next section.

### ISSUE NO. 7:

Plaintiff asserts that the ALJ failed to ask the vocational expert a hypothetical question which included all of plaintiff's exertional and non-exertional limitations. In response, defendant asserts that the ALJ's hypothetical question to the vocational expert was proper.

The ALJ asked the vocational expert to identify jobs that could be performed by a younger person with an AA degree and no past relevant work who could do non-complex and non-detailed medium work.[6] The vocational expert testified that said person could be a hand packer or a cleaner, neither of which required much social or public interaction. (See AR 554-55). The ALJ relied on the vocational expert's testimony in determining that plaintiff was not disabled. (See AR 378).

---

[6] See footnote 4, infra.

As discussed above, the ALJ properly rejected plaintiff's subjective complaints, including pain testimony.  Further, as discussed above, the ALJ properly determined plaintiff's residual functional capacity (medium work, no complex or detailed work, no unprotected heights or dangerous moving machinery).  Plaintiff does not specify what additional limitations should have been included in the hypothetical question to the vocational expert.  Consequently, the ALJ was not obligated to pose a hypothetical question to the vocational expert setting out additional limitations.  See Magallanes, supra, 881 F.2d at 756-77.

**ISSUE NO. 8:**

Plaintiff asserts that the ALJ has failed to evaluate new evidence.  Plaintiff claims that the new evidence relates to her hospitalizations at Harbor/UCLA Medical Center in 2008, and includes the following:  "[R]eports by Dr. Elmer Chang, M.D., found that there was a number of symptoms, including edema and erythematous of the small trac with internal hemorrhoids[.]"[7]  Plaintiff also states:  "We have now heard from the plaintiff [that] there is a definite diagnosis of Crohn's disease.  This hereditary disease caused the inflammatory and obstructive symptoms described in the plaintiff's evidence presented and testimony."[8]

In response, defendant asserts that the matter should not be remanded because the new evidence is not material.

The Court may order a case remanded to the Commissioner for further consideration "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior

---

[7] Neither party has provided the Court with a copy of the new evidence.  According to defendant, the records relating to plaintiff's hospitalizations are dated February 2008 through April 30, 2008.

[8] Plaintiff has failed to provide the Court with any records of her diagnosis or treatment for Crohn's disease.

proceeding." 42 U.S.C. § 405(g).  New evidence is material if it bears directly and substantially on the matter in issue and there is a real possibility that the new evidence would have changed the outcome if it been before the Commissioner.  See Cotton v. Bowen, 799 F.2d 1403, 1409 (9th Cir. 1986).  "At a minimum, such evidence must be probative of mental or physical impairment."  Key v. Heckler, 754 F.2d 1545, 1551 (9th Cir. 1985).

There is no indication that the records from plaintiff's 2008 hospitalizations are probative of plaintiff's physical impairments from December 16, 1999 (the date of plaintiff's application) through August 22, 2005 (the date of the ALJ's Decision).  See Cotton v. Bowen, supra; 20 C.F.R. § 404.970 (Evidence is new and material only where it relates to the period on or before the date of the ALJ's decision).  Moreover, since no evidence of plaintiff's diagnosis and/or treatment of Chron's disease has been submitted to the Court, plaintiff has failed to show such evidence is material.

## ORDER

For the foregoing reasons, the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed.

DATED: May 15, 2009

/ s /

---

STEPHEN J. HILLMAN
UNITED STATES MAGISTRATE JUDGE